| UNITED STATES OF AMERICA, | |
|---|---|
| v. | No. 3:19-cr-172 (MPS) |
| JULIO MARTINEZ | |

**RULING ON MOTION TO SUPPRESS (ECF No. 126)**

On June 27, 2019, a grand jury returned an Indictment charging fifteen individuals with various drug and firearm offenses. ECF No. 21. The only charge in the Indictment against Defendant Julio Martinez is Count Seventeen, which charges him with conspiracy to unlawfully possess firearms by a felon, in violation of 18 U.S.C. § 371. *Id.* at 10–11.[1] Martinez has moved to suppress evidence observed during a stop and search of his person on April 22, 2019. ECF No. 126. The Court held a two-day evidentiary hearing on the motion to suppress on November 14, 2019 and November 27, 2019. Based on the evidence presented and for the reasons set forth below, the motion to suppress is granted in part and denied in part.

## I.  FACTUAL FINDINGS

At the evidentiary hearing, the Court heard testimony from five Government witnesses (FBI Special Agent David Carney, FBI Special Agent Adam Schepis, Detective Jeffrey Moody of the Hartford Police Department, Detective Mark Rinaldi of the Hartford Police Department, and Detective Abhilash Pillai of the Hartford Police Department) and two Defense witnesses (Erik Eichler, an investigator for defense counsel, and Eva Perez, the manager of the store where

---

[1] Count Seventeen of the Indictment charges both Martinez and co-Defendant Carlos Soto with conspiracy to unlawfully possess firearms by a felon.

the stop and search occurred). Based on that testimony, the exhibits admitted into evidence, and the representations of counsel, I make the following findings of fact.

## A. Intercepted Phone Calls

All five Government witnesses are officers with the Northern Connecticut Violent Crimes Gang Task Force (the "Task Force"), a collaboration between the FBI, Connecticut State Police, the Hartford and East Hartford Police Departments, and the Connecticut Department of Corrections. November 14 Hr'g Tr. at 3–4. In March 2019, the Task Force initiated wiretaps on four target telephones associated with co-Defendant Ricardo Reyes, who the Task Force suspected was affiliated with a gang and who had prior felony convictions, including a 2006 conviction for dealing firearms without a license. November 14 Hr'g Tr. at 5–7. At the hearing, the Government introduced line sheets from the Government's wiretap, transcribing calls made or received by Ricardo Reyes on "target telephone 2" between April 18, 2019 and April 22, 2019. *Id.* at 7–9 (describing the process for creating line sheets). Between April 18 and April 22, the Government intercepted multiple calls and text messages between Reyes and a telephone number later identified as that of co-Defendant Carlos Soto[2] which suggested that they were planning a firearm transaction. On the calls, Reyes and Soto refer to "toys," which SA Carney testified is slang for firearms. *E.g.* Gov't Ex. 1 (Soto stated on April 18, "Yo what up with um, remember that dude to get . . . the thing the toy."); Gov't Ex. 3 (Reyes texted, "Yo my man ready ur boy wants them toys."); November 14 Hr'g Tr. at 13. They also discuss pricing and a "buck

---

[2] As of April 18, 2019, the Task Force had not yet associated the phone number with Carlos Soto. The Task Force connected the number to Soto later that week. Officers photographed Soto with Reyes during surveillance on April 22, 2019, and local police were able to identify the man in the photo as Carlos Soto, a/k/a "Puchie." The Task Force connected Soto with the phone number based on surveillance observations and the incoming call they observed on Julio Martinez's phone during the April 22 stop. *See* November 14 Hr'g Tr. at 12.

right on top," which SA Carney interpreted as a $100 service fee for the transaction. *See* Gov't Ex. 1 (Soto stated, "he wants a buck right on top" and asked, "the one you got that shit was how much you paid for that. That shit was like two, two seventy five," to which Reyes responded, "yea like two something plus the buck."); November 14 Hr'g Tr. at 13. In the calls, Reyes also refers to an individual he needs to contact regarding the firearms transaction. Gov't Ex. 2 at 1–2 (Reyes tells Soto, "I wait for my man to pick up . . . he gotta . . . get to . . . an internet connection . . . for me to call him but you gotta let me know . . . when you peoples available . . . how much he got to spend  because remember we working with his price."). The Task Force believed, based on these calls, that Reyes was "facilitating" and Soto was "middling" a firearms transaction involving a straw purchaser and an undisclosed end-buyer, and that the end-buyer was willing to pay a $100 fee on top of the cost of the firearms. *Id.* at 16.

After intercepting the text message from Reyes at 12:23pm on April 22 stating, "Yo my man ready," the Task Force assembled a team of about twelve officers to surveil Reyes and the suspected firearms transaction. *Id.* at 17–18. They located Reyes in a vehicle on the afternoon of April 22 and began following him as he drove from Hartford to New Britain, Connecticut, where they observed him meeting with an individual later identified as Soto. *Id.* at 18, 23. Although they did not know Soto at the time, they suspected this meeting might be connected to the anticipated firearms transaction because "New Britain's not an area where Reyes would usually be," and the meeting took place on Arch Street, which was mentioned in the intercepted calls regarding the gun deal. November 14 Hr'g Tr. at 25; Gov't Ex. 5 (Reyes asking Soto, "where you at you on Arch?"). Soto called Reyes at 12:24pm, and Reyes said "I need to know how much bread he got, what he want, I'm going to look for him the cheapest that we can get it. . . . and if theres something left over then I'll bring it back to him if not then he'll get the receipts. . . . he go

grab them right now." Gov't Ex. 4. SA Carney testified that "bread" referred to money, and that

the mention of "receipts" suggested that Reyes would use a third-party purchaser who had a

license to purchase the firearms legally. November 14 Hr'g Tr. at 20–21. Reyes then called

Norman Klosek, who the Task Force believed was going to serve as the third-party purchaser,

and told him, "we about to do business . . . you going to make something nice today alright."

Gov't Ex. 4. At the time the Task Force Officers intercepted Reyes's call to Klosek, they had not

yet identified Klosek. Ten minutes after the initial call, however, Klosek texted his street address

in Enfield to Reyes. Gov't Ex. 6. Within "[p]robably no less than 10 minutes" after intercepting

the street address, Task Force Officers linked it to Norman Klosek and determined, after

checking a database, that Klosek had purchased 45 registered firearms within the past six

months. November 14 Hr'g Tr. at 27–29.

The Task Force surveillance then followed Reyes as he drove to Enfield, CT, where he

picked up Klosek, and then to the Newington Gun Exchange, a firearms retail store. November

14 Hr'g Tr. at 31–32. Task Force officers observed Klosek enter the Newington Gun Exchange,

and one Detective entered the store undercover to monitor Klosek's activities. *Id.* at 34. The

Detective saw Klosek at a display case and in the process of purchasing a gun, and then other

officers saw Klosek leave the store with a black plastic bag in hand and return to Reyes's

vehicle. *Id.* at 34–35. After Reyes drove away, Task Force officers entered the Newington Gun

Exchange and verified that Klosek had just purchased two firearms: a 9mm pistol and a .380

pistol. *Id.* at 36–37.

### B. Observations at 339 High Street

Task Force officers then followed Reyes's vehicle to Hartford and on towards New

Britain, CT. *Id.* at 37. At 5:03pm, Soto called Reyes, and Reyes stated, "I got them already . . .

Get over there to T house . . . just make sure homes got the whole EIGHT." Gov't Ex. 11. SA Carney testified that he believed Reyes was telling Soto and the end-buyer to meet him at "T house," and that the end-buyer needed to pay $800. *Id.* at 38, 40. Soto also stated, "I'm going to tax them to[o]," suggesting that Soto was going to add an additional service fee. *Id.* at 39. At 5:50pm, Soto called Reyes and stated he was "already here at T house, I'm about to go up the stairs in thirty seconds." Gov't Ex. 12. Reyes asked, "What are you going to do he there," and Soto replied, "I'm about to tell him to pull up." *Id.* At 5:58pm, Reyes called Soto, stating that he was "in the back." Gov't Ex. 13. Detective Abhilash Pillai, an officer with the Hartford Police Department and assigned to the Task Force, testified that he observed Reyes arrive at 339 High Street, pull into a driveway, exit his vehicle, holding the same black plastic bag that Klosek was carrying when he left the Newington Gun Exchange, and enter 339 High Street through a back door. November 14 Hr'g Tr. at 73–74.

About 10 minutes after Reyes arrived at 339 High Street, Detective Pillai observed a blue pickup truck arrive at 339 High Street. *Id.* at 75, 78. A man later identified as Julio Martinez exited the truck and walked to the rear of the building. *Id.* "[M]oments later," Detective Pillai saw the front door of 339 High Street open for a few seconds, during which time he saw Soto holding the black plastic bag and Reyes standing in a small hallway. *Id.* at 75–76. The door closed. Martinez then returned to the front of the building. Detective Pillai saw the front door open again and saw Soto inside the entrance. He then saw Martinez enter the front door. *Id.* at 76. Less than two minutes later, Detective Pillai saw Martinez exit the front door, talking on his cell phone. *Id.* at 77, 80. Detective Pillai also testified that the front pocket of Martinez's hooded sweatshirt appeared to be weighted down. *Id.* at 77. Both SA Carney and FBI Special Agent Adam Schepis testified that they recall hearing that observation over the Task Force team's

radio. *Id.* at 49 (SA Carney testified, "What was transmitted over the radio is Mr. Martinez's hoodie his front pocket was weighted down."); *id.* at 94 (SA Schepis testified, "I remember someone said that they believed his shirt looked like it was sagging, which led us to believe that he may have had a firearm."). Detective Pillai then saw the blue pickup truck return and saw Martinez enter the vehicle. *Id.* at 77. Based on these observations and the other information known to them at the time, SA Carney testified, the Task Force believed that Martinez was the end-buyer of the firearms transaction and that he now had possession of at least one of the two firearms Klosek had purchased that afternoon. *Id.* at 49–50. The Task Force decided to try to intercept Martinez with the suspected firearm(s), so officers followed the blue pickup truck to a nearby grocery store, Compare Foods. *Id.* at 50, 64.

### C. *Terry* Stop and Search of Julio Martinez

At Compare Foods, SA Carney saw Martinez exit the blue pickup and observed that his sweatshirt pocket appeared weighted down, *id.* at 50, although this observation was not included in the report he later prepared concerning the events of that day, *id.* at 66. SA Carney saw Martinez enter the store, and SA Carney entered the store along with Detective Moody, Detective Rinaldi, and SA Schepis. *Id.* at 50–51. The officers met Martinez as he was exiting the store, in a vestibule area of the store. *Id.* at 51–52. Based on their suspicion that Martinez had at least one firearm on his person, the officers put him in handcuffs and performed an "emergency quick sweep of his person." *Id.* at 52. Specifically, SA Schepis testified that he grabbed Martinez's left arm while Detective Moody grabbed the right arm. SA Schepis took a cell phone "and some other stuff" out of Martinez's hands and placed the items on top of some nearby bags of food. *Id.* at 97; *see also id.* at 111. Detective Moody put Martinez in handcuffs while SA Schepis performed "a very quick cursory search on the small of Mr. Martinez's back to see if

there was a firearm there." *Id.* SA Schepis initially testified that he did not recall searching or patting down any other part of Martinez's body other than the small of the back. *Id.* at 99. Later, after viewing security camera footage of the incident that was presented at the hearing, SA Schepis testified that it appeared from the video that he had put his hand inside the front pocket of Martinez's hoodie, though he did not "have an independent memory of that." November 27 Hr'g Tr. at 71; *see also* Def. Ex. 30.

Detective Moody also testified that he performed a "[q]uick pat-down for weapons" on Martinez's "[w]aistband area and legs" after Martinez was handcuffed, but did not find any weapons or other items. November 14 Hr'g Tr. at 111–12. Detective Moody recalled that Martinez had "his phone and some money" in his hands when the Officers handcuffed him, and that SA Schepis placed the items on sacks of food. *Id.* at 111. Detective Rinaldi testified that he did not participate in any pat-down of Martinez but entered the main part of the store to assist SA Carney, who had also entered the main part of the store. When he returned to the vestibule area, Detective Rinaldi learned that Martinez was going to be released, so he "counted his money in front of him before turning it back over so there was no discrepancies of any money being missing or anything." November 14 Hr'g Tr. at 124. He testified that the money was "separated" into "two separate stacks or pile[s]," and that "[t]here was $650, which was he said came off his person and then additional [$]200 which [had been] clenched in his hand." *Id.* at 124–125 (testifying that there were ten $20 bills "from his hand" and that the "rest of the money"—twenty $20 bills and five $50 bills—was "[f]rom his person"). Detective Rinaldi did not recall how he learned that one stack of money had come "from [Martinez's] person." *Id.* at 125, 129–30. At the conclusion of the evidentiary hearing, counsel for the Government conceded "that the $650 comes out of Mr. Martinez's pocket," based on what was written in the Task Force report of the

incident, "other independent testimony and memories of some of the agents," and the ATM records from Compare Foods showing a $200 transaction shortly before the stop.[3]  November 27 Hr'g Tr. at 97–98.

While Schepis and Moody were handcuffing Martinez, SA Carney proceeded into the store "to make sure that there was no other individual that he could have had a hand-to-hand transaction with" and to ask store staff where Martinez had gone inside the store. *Id.* at 53. SA Carney did not see any other customers, and learned from a store employee that Martinez had only accessed the ATM. *Id.* When he returned to the vestibule, SA Carney noticed some cash, a cell phone, and an ID on top of some bags of food. *Id.* at 54. The phone was ringing, and the screen was visible, displaying the number that was calling. *Id.* SA Carney saw that the incoming call was from the same number Ricardo Reyes had been calling throughout the day—*i.e.*, Carlos Soto's phone number. *Id.* at 54–55. Around this same time, Task Force Officers stationed at 339 High Street observed Soto out in front of the building, on his phone and looking up and down the street. *Id.* at 56. About ten minutes after stopping Martinez, the officers released him and returned all personal property to him, including the phone, all cash, and the ID. *Id.* at 56–57.

### D.  Motor Vehicle Stop of Ricardo Reyes

Back at 339 High Street, Officers observed Reyes exiting the building, carrying the black plastic bag Officers had observed earlier, and entering his vehicle. *Id.* at 57. Officers followed Reyes's vehicle, and the Task Force decided to conduct a motor vehicle stop in order to intercept the firearms they believed he was carrying in the black plastic bag. *Id.* at 57–58. In coordination with the Task Force, New Britain Police effected a traffic stop and recovered the two firearms

---

[3] Neither the law enforcement report nor any ATM records were entered into evidence.

that Klosek had purchased earlier from the Newington Gun Exchange: a 9mm pistol and a .380 pistol. *Id.* at 58–59. At the Task Force's direction, police seized both weapons. *Id.* at 59.

## II. LEGAL ANALYSIS

Martinez moves to suppress "any evidence which the government may seek to introduce at trial including law enforcement testimony regarding the observations of Martinez at 339 High Street and the observations of the items searched by the police at the *Terry* stop of Martinez." Mot. to Suppress, ECF No. 126 at 13. He argues both that the officers did not have a valid basis to perform a *Terry* stop and that the search of Martinez's pockets "exceeded the limited frisk of the outside of the clothing envisioned under *Terry.*" *Id.* at 10. Following the evidentiary hearing, counsel for Martinez clarified his argument, asserting that if the *Terry* stop was unconstitutional, all observations about Martinez's cell phone and cash should be suppressed. He also argued that, if the Court were to find that the *Terry* stop was constitutional but that any search of Martinez's pockets was not, the officers' observation of the $650 should be suppressed.

I find that the Government had reasonable suspicion to perform the *Terry* stop of Martinez, but I agree that the search of his pockets exceeded the limits of such a stop.[4] Therefore, I grant the motion to suppress the officers' observations of $650 as the fruit of an illegal search.

---

[4] The evidence at the hearing alone does not clearly support a finding that the $650 was seized during a search of Martinez's pockets. No witness testified that such a search occurred. Nonetheless, SA Schepis testified at the November 27, 2019 hearing that the security video presented at that hearing appears to show him reaching into the pocket of Martinez's hooded sweatshirt. November 27 Hr'g Tr. at 71. I agree that this is a reasonable interpretation of his hand movements on the somewhat unclear video, although the video does not appear to show his hand emerging from the sweatshirt pocket with a wad of cash. In addition, defense counsel pointed out that the "separate stack[]" of $200 found on the sacks of food, November 14 Hr'g Tr. at 125, likely came from Martinez's hand, given the testimony that he had just used the ATM inside the store—making it likely that the stack of $650 had come from some other place on his person, November 27 Hr'g Tr. at 95. But, to the extent the evidence is ambiguous, the Government's concession after the close of the evidence that the $650 was removed from Martinez's pocket resolves the issue. *See id.* at 97–98.

With respect to all other observations of Martinez at 339 High Street and in the store vestibule, including the screen of his cellphone and the $200 of cash in his hand, the motion to suppress is denied.

### A. Observations of Martinez at 339 High Street

In his motion, the defendant seeks to suppress "law enforcement testimony regarding the observations of Martinez at 339 High Street." Mot. to Suppress, ECF No. 126 at 13. His motion does not articulate a basis for suppressing these observations, other than to point out some inconsistencies between the FBI 302 report and a Title III affidavit, neither of which was entered into evidence. *Id.* at 11–12. The Government argues that the observations of Martinez at 339 High Street do not implicate the Fourth Amendment because Martinez was in public view and had no reasonable expectation of privacy on a public street or in the hallway of a multi-unit apartment building. Gov't Opp'n, ECF No. 133 at 7–8. I agree with the Government.

"Fourth Amendment protections extend only to unreasonable government intrusions into . . . legitimate expectations of privacy." *United States v. Reyes*, 283 F.3d 446, 457 (2d Cir. 2002); *see also Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). "The party moving to suppress bears the burden of establishing that his own Fourth Amendment rights were violated," so "the movant must show that he had an expectation of privacy in the invaded place and that the expectation was legitimate." *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991). Martinez has offered no evidence to suggest that he had a reasonable expectation of privacy with regard to his activities on the premises of 339 High Street, including those in the common hallway of the building. Nor has he offered evidence that law enforcement officers invaded any expectation of privacy at 339 High Street. The Task Force officers observed his

actions from across the street; they did not approach him or set foot upon the property. The motion to suppress any of these observations is therefore denied.

### B. *Terry* Stop of Martinez

Martinez also argues that "the police did not articulate a basis to justify a *Terry* pat down," making any evidence observed during the stop "the fruit of an unconstitutional search and seizure." Mot. to Suppress, ECF No. 126 at 10, 1. An investigative stop must be both "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

Focusing first on the stop—not on any pat-down or search—I find that the Government has shown it had a legitimate basis to stop Martinez in the vestibule of Compare Foods. "The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) ("[A]n officer may conduct [a *Terry* stop] as long as the officer has reasonable suspicion that the person to be detained is committing or has committed a criminal offense."). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (internal citations and quotation marks omitted). Based on "the totality of the circumstances—the whole picture . . . . the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal

activity." *Cortez*, 449 U.S. at 417–18 (noting that development of reasonable suspicion "does not deal with hard certainties, but with probabilities"); *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (noting that a series of acts, each innocent in itself, could collectively amount to reasonable suspicion).

"At a suppression hearing, the government bears the burden of showing, by a preponderance of the evidence, that the evidence was lawfully obtained." *United States v. Townsend*, 371 F. App'x 122, 123–24 (2d Cir. 2010). I find that the Government met its burden with respect to the stop of Martinez, since the evidence presented shows that the Task Force officers had a "particularized and objective basis" to suspect that Martinez had taken part in an illegal firearms transaction. First, the intercepted calls and text messages between Ricardo Reyes, Carlos Soto, and Norman Klosek between April 18, 2019 and April 22, 2019 show that Reyes and Soto were planning a firearms transaction involving Klosek as a straw purchaser and an unknown end-buyer. *See, e.g.*, Gov't Ex. 3 (Reyes texted, "Yo my man ready ur boy wants them toys."); Gov't Ex. 4 (Reyes stated, "I need to know how much bread he got, what he wants, I'm going to look for him the cheapest that we can get it . . . and if theres something left over then I'll bring it back to him if not then he'll get the receipts."). These communications, along with the Task Force's other knowledge about Reyes and Klosek, also suggested that the transaction would be unlawful. Reyes had previously been convicted of selling firearms without a license, so it was reasonable to infer that he still did not have a license to sell firearms. The use of Klosek as a straw purchaser, an inference confirmed by information that he had purchased 45 firearms in the previous six months, also supported the suspicion that the transaction was not legal, suggesting that neither Reyes, Soto, nor the end-buyer would be able to purchase the firearm legally himself.

Task Force officers surveilling Reyes on April 22 also observed Reyes meet with an individual later identified as Soto at Arch Street, which had been mentioned in the calls regarding the transaction. They also observed Reyes pick up Klosek and drive him to the Newington Gun Exchange, where Klosek purchased two firearms. They then observed Reyes drive to New Britain, where Reyes and Soto, whom they had been surveilling since Reyes met with him earlier in the day, both entered 339 High Street in quick succession. November 14 Hr'g Tr. at 41, 43. Officers observed Reyes carrying the same black plastic bag into 339 High Street that Klosek was carrying when he left the Newington Gun Exchange. These observations, together with intercepted communications, provided a reasonable basis to believe that the firearm transaction would occur at 339 High Street in the early evening of April 22, after Soto and Reyes arrived. *See* Gov't Ex. 11 (Reyes stated, "Get over there to T house . . . just make sure homes got the whole EIGHT."); Gov't Ex. 12 (Soto stated, "I'm already here at T house, I'm about to go up the stairs in thirty seconds . . . I'm about to tell him to pull up."); November 14 Hr'g Tr. at 75–76 (Detective Pillai testifying that he saw Soto open the front door of 339 High Street "while carrying that same black plastic bag that Mr. Reyes had prior" and saw Reyes standing behind Soto in the hallway).

Officers' observations of Martinez at 339 High Street also provided a reasonable basis to suspect that Martinez was the end-buyer of this planned firearm transaction. In the 10-15 minutes after Reyes arrived at 339 High Street, the only person to enter or exit the building was Martinez. November 14 Hr'g Tr. at 78. Martinez's behavior at 339 High Street also suggested that he did not live there and was not familiar with the building: he was dropped off by a blue pickup truck that then drove away, he went to the back of the building for a couple minutes before returning to the front door and entering there, and he remained inside the building for "less than two

minutes." *Id.* at 78–80. Spending less than two minutes inside the building also suggests Martinez was not there to pay a social visit to someone in the building. And the fact that the blue pickup truck did not linger but then returned to pick up Martinez is mildly suggestive of illegal activity, since it suggests that the driver of the truck did not want to wait in front of 339 High Street, even though Martinez was only there for a few minutes. Finally, Detective Pillai personally observed that Martinez's sweatshirt pocket appeared weighted down when he left 339 High Street, *id.* at 77, he communicated that observation over the Task Force's radio, *id.* at 49, 94, and SA Carney made the same observation when he saw Martinez enter Compare Foods, *id.* at 50.

Based on these observations of Martinez, together with the reasonable belief that Reyes and Soto were orchestrating a firearms transaction at 339 High Street around the time of Martinez's arrival, I find that the officers had reasonable suspicion to believe that Martinez was the contemplated end-buyer and that, upon leaving 339 High Street, was carrying at least one firearm that he had purchased from Reyes and Soto. Courts have approved investigative stops under analogous circumstances, where a defendant, empty-handed, enters a building known or suspected to be a location for criminal activity and leaves a short time later, appearing to carry a new item. *See United States v. Vasquez*, 638 F.2d 507, 523 (2d Cir. 1980) (finding that an investigatory stop was "fully justified" when officers "had reason to believe that [a certain address] was being used for the distribution of narcotics," and the defendant was "observed entering [the address] empty-handed and leaving ten minutes later with a shopping bag"); *United States v. Terry*, 718 F. Supp. 1181, 1184–85 (S.D.N.Y. 1989) ("[A] reasonable articulable suspicion of narcotics activity existed where a person enters a building known to be a location where drug sales are conducted empty-handed, and leaves after a short period of time carrying a

bag."), *aff'd*, 927 F.2d 593 (2d Cir. 1991). Therefore, I find that the *Terry* stop of Martinez at the Compare Foods was justified by reasonable suspicion that Martinez had participated in an illegal firearms transaction at 339 High Street and was carrying a firearm.

### C. Observations of Cell Phone Screen and $200 in Martinez's Hand

In his motion, Martinez also seeks to suppress "observations of the items searched by the police at the *Terry* stop" as "fruit of an unconstitutional search." ECF No. 126 at 13, 1. As to the cell phone and the $200, however, Martinez has not offered any evidence to suggest that the observation of such items went beyond the scope of the officers' valid *Terry* stop.

As mentioned above, a *Terry* stop must be both "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). "There are no hard and fast rules for evaluating the conduct of law enforcement agents conducting investigative stops. A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990). For this reason, the Fourth Amendment "occasionally will permit handcuff usage during a *Terry* stop when the police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat," such as when "act[ing] based on reliable information that a suspect was armed and possibly dangerous." *United States v. Fiseku*, 915 F.3d 863, 871–72 (2d Cir. 2018) (internal quotation marks and alterations omitted); *see also United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014) ("The relevant inquiry [regarding the use of handcuffs during a *Terry* stop] is whether police have a

reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat.")

Other than to argue that the stop itself was not supported by reasonable suspicion, Martinez has not argued that the Task Force officers' use of handcuffs was unreasonable or beyond the scope of an otherwise valid *Terry* stop. The evidence at the hearing showed that the officers had reasonable suspicion to believe that Martinez had just participated in an illegal firearms transaction and that he was carrying at least one firearm in the pocket of his sweatshirt. Based on their observations, it was reasonable for the officers to believe that Martinez was "armed and possibly dangerous," and so to handcuff Martinez and perform a quick sweep of his waistline to check for firearms. While they were handcuffing him, it was reasonable—and likely necessary—to remove any items he was holding in his hands and to set them aside.

Martinez has not shown that the observations of the cell phone or the $200 were discovered by any improper search after he was stopped and handcuffed or that he had a reasonable expectation of privacy in the items once he was lawfully stopped. Rather, the evidence suggests that these items were in his hands when he was stopped, and that officers placed them aside when they handcuffed him. *See* November 14 Hr'g Tr. at 97, 111. As the items were set on top of nearby sacks of food, both the screen of the cell phone and the $200 were in plain view of all in the store vestibule. In fact, following the evidentiary hearing, Martinez's counsel conceded that, if the *Terry* stop was legal, then "the money in his hand is in plain view. . . . There's no basis to suppress that," and "if [the cell phone] was in his hand the same analysis, it's in plain view." November 27 Hr'g Tr. at 83. I agree. If law enforcement officers are lawfully present in an area, they are entitled to observe objects in plain view, since, in general, "visual observation is no 'search' at all." *Kyllo v. United States*, 533 U.S. 27, 32

(2001); *Horton v. California*, 496 U.S. 128, 133 (1990) ("If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy."); *Texas v. Brown*, 460 U.S. 730, 738 n.4 (1983) (noting that "an officer's mere observation of an item left in plain view . . . . generally involves no Fourth Amendment search"). Because he has not shown that any search occurred, I find there is no basis to suppress the Task Force Officers' observations of Martinez's cell phone screen (including the incoming call from a number associated with Carlos Soto) or their observations of $200 in cash in Martinez's hand.

**D. Search of Martinez's Pockets and Observation of $650**

Finally, Martinez seeks to suppress the observation of $650 since the "police searched his pockets," an "intrusion which exceeded the limited frisk of the outside of the clothing envisioned under *Terry*." Mot. to Suppress, ECF No. 126 at 10. The Government concedes that officers removed the $650 from Martinez's pocket, but advances several arguments against suppressing the evidence: (1) that the officers had "probable cause to believe that there may be other evidence on [Martinez's] person . . . that would support him participating in the gun transaction," and that exigent circumstances justified the search, since officers were worried about "destruction of evidence," November 27 Hr'g Tr. at 103; (2) that the search qualified as a "search incident to arrest," *id.* at 103; (3) that removal of the money was justified under the "plain feel doctrine," Gov't Opp'n, ECF No. 133 at 13; and (4) that the observations should not be suppressed, even if the search was unlawful, since the exclusionary rule is an "outcome of last resort" and the "good faith" exception applies, *id.* at 101. I discuss each argument below. I find that none of these arguments justifies the warrantless search of Martinez's pocket, and that suppression is the appropriate remedy for the Task Force officers' constitutional violation.

*1. Warrantless Search*

First, I find that Task Force Officers did conduct a search of Martinez's pockets, that $650 of cash was removed from a pocket, and that such a search exceeded the scope of a valid *Terry* stop and protective frisk. When a person is lawfully subjected to a *Terry* stop, law enforcement "must employ the least intrusive means reasonably available to effect their legitimate investigative purposes." *Bailey*, 743 F.3d at 339. Officers may conduct a pat-down if they have "reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). But any pat-down must be "reasonably related in scope to the justification for [its] initiation," so a search justified by a suspicion that the suspect is armed must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29.

Courts have held that an "officer's continued exploration of [a suspect's] pocket after having concluded [through a pat-down] that it contained no weapon was unrelated to [t]he sole justification of the search [under *Terry*:] . . . the protection of the police officer and others nearby," and so was not authorized under *Terry*. *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) (alterations in original); *see also Sibron v. New York*, 392 U.S. 40, 65 (1968) (finding that law enforcement exceeded the scope of a *Terry* stop-and-frisk when the officer "thrust his hand into [the defendant's] pocket" before making any "attempt at an initial limited exploration for arms"). Even if officers show they had reasonable fear during a *Terry* stop that a subject is armed and dangerous, the Government still must justify the scope of the search performed. *United States v. Casado*, 303 F.3d 440, 447 (2d Cir. 2002) (finding that an officer's search of the subject's pocket was "not reasonably limited in scope" to protecting the officers and disarming the subject where the officer did not attempt any external pat-down of the pocket before taking

"the more intrusive step of reaching inside [the subject's] pocket and removing everything in it"); *id.* at 448 ("To determine whether the search was reasonable, we therefore must consider whether obvious, commonly employed, and effective alternatives were available under the circumstances.").

Th evidence at the hearing was ambiguous about precisely where officers located the $650 in cash, *see supra* note 4, but the Government's counsel stipulated following the hearing that the $650 was removed from Martinez's pocket. November 27 Hr'g Tr. at 97–98 ("I would have to concede that the $650 comes out of Mr. Martinez's pocket."). Though none of the Task Force Officers who testified remembered searching any of Martinez's pockets, November 14 Hr'g Tr. at 52, 97, 111–12, video footage of the stop suggests that SA Schepis may have searched at least the front pocket of Martinez's sweatshirt. *See* Def. Ex. 30; November 27 Hr'g Tr. at 71 (After viewing video footage of the stop, Def. Ex. 30, SA Schepis testified that it appeared from the video that he had put his hand inside the pocket of Martinez's hoodie, though he did not "have an independent memory of that."). While the video footage is low-resolution and not a continuous clip, making it difficult to determine precisely what occurred or whether anything was removed from any pocket searched, I find that SA Schepis's interpretation of the video is plausible, and it supports the Government's concession that the $650 came from one of Martinez's pockets. In addition, as defense counsel pointed out at the hearing, the evidence that Martinez had cash in his hand after using the ATM, together with Detective Rinaldi's testimony that he observed "two separate stacks or pile[s]" of cash placed on the sacks of food, also supports the notion that some of the money—one of the stacks—came from Martinez's pocket.

The officers' testimony at the hearing suggests that they had already determined from their initial protective sweep of Martinez's waistline and lower back that he was not armed

before they conducted any search of his pockets. The officers did not discover any weapons during their initial sweep, and none of them testified that they patted down Martinez's pockets before removing the contents. The security video also makes clear that the segment SA Schepis interpreted as showing him reaching into Martinez's sweatshirt pocket occurred a few minutes after the initial sweep and handcuffing, and in another part of the vestibule. Based on this evidence, further exploration of Martinez's pockets after the initial pat-down went beyond the goal of assuring officer safety and beyond the scope of the valid *Terry* stop. *Minnesota*, 508 U.S. at 378; *Casado*, 303 F.3d at 449 (finding a search of the defendant's pockets "unreasonable" where the officer "could have protected his safety and the safety of others by employing the less serious intrusion, a patdown, [where] the method was obvious and well known to him, and [where] there is no valid reason apparent on the record for his not using it"). The search of Martinez's pockets therefore constituted a warrantless search of his person.

### 2. Exigent Circumstances Exception

"Warrantless searches . . . are per se unreasonable, subject to a few well-delineated exceptions." *United States v. Vasquez*, 638 F.2d 507, 530 (2d Cir. 1980). Once a defendant has shown that law enforcement officers conducted a warrantless search, then the burden shifts to the government to show that the search was "lawful because it fell within one of the exceptions to the warrant requirement." *United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017); *see also United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999) ("If the place or object subjected to the warrantless search is one in which the defendant had a reasonable expectation of privacy, the burden of showing that the search fell within one of the exceptions to the warrant requirement is on the government."). One recognized exception is "exigent circumstances," which "refer[s] generally to those situations in which law enforcement officers will be unable or unlikely to

effectuate an arrest, search or seizure for which probable cause exists, unless they act swiftly, even though they have not obtained prior judicial authorization." *United States v. Gallo-Roman*, 816 F.2d 76, 79 (2d Cir. 1987). For instance, officers may be justified in seizing evidence without a warrant if there is a risk that the evidence might be destroyed otherwise. *Schmerber v. California*, 384 U.S. 757, 770–72 (1966) (finding that warrantless test of blood-alcohol content did not violate the Fourth Amendment because the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence"). Importantly, the "exigent circumstances exception does not *substitute* for the probable cause requirement; rather, it *supplements* the probable cause requirement and allows for a search or seizure only if there is also some exigency that will not allow for resort to the normal search-and-seizure warrant application process." *United States v. Robertson*, 239 F. Supp. 3d 426, 453 (D. Conn. 2017).

The Government argued after the hearing that Task Force Officers were concerned that "if they let [Martinez] go at that point in time [following the stop], any other potential evidence on his person would be lost forever. There would be no observations made." November 27 Hr'g Tr. at 102. However, the testimony of the Task Force Officers at the evidentiary hearing does not support this argument. None of the officers even specifically remembered searching Martinez's pockets, and none of them testified that he was concerned about the destruction of evidence.[5]

In any event, the Government has not shown that the officers had probable cause at the time they searched Martinez's pockets to believe that he had evidence of a crime on his person.

---

[5] At the hearing, the Government suggested that returning the phone, cash, and identification card to Martinez when the officers released him was not necessarily inconsistent with a concern about destruction of evidence, since retaining the evidence might have tipped off Martinez—and ultimately Reyes—that Reyes's phone was tapped. November 27 Hr'g Tr. at 104. Still, no officer testified that he was concerned that Martinez would destroy evidence.

Probable cause to conduct a search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). As discussed above, at the time the officers initiated the *Terry* stop, they had reasonable suspicion that Martinez was the end-buyer in an illegal firearm transaction and that he was carrying a firearm. However, the evidence the officers had at the time of the stop fell short of establishing probable cause to search Martinez's pockets. The officers suspected that Martinez had just purchased at least one firearm at 339 High Street, but it was only a suspicion based on the timing of Martinez's arrival at that location, his quick departure, conduct suggesting he was not familiar with the building, and a weighted-down sweatshirt pocket. At the time of the stop, the officers had no evidence tying Martinez to either Reyes or Soto, other than the brief observation of Soto in the entrance hallway of 339 High Street when Martinez opened the front door to the building. And their initial, reasonable suspicion that Martinez was carrying a firearm was not borne out by their initial protective pat-down. They had removed a cell phone and some cash from his hands, but, especially given the absence of a firearm, this evidence did not amount to probable cause that he had evidence of a crime in his pockets. Thus, immediately after the stop and the initial pat-down, the evidence as a whole did not provide probable cause to believe that Martinez had evidence of a crime on his person.

Finally, the Government did not show that the officers acquired any additional, pertinent information (such as seeing the incoming call from the number associated with Soto) between initiating the stop and searching Martinez's pockets. The precise timing of the search is unclear, since none of the officers remembered searching Martinez's pockets and since the video footage is not a continuous clip. *See* Def. Ex. 30. Nor does the evidence support an inference that the

$650 could *only* have been seized from Martinez's pockets during the portion of the video in which SA Schepis apparently reached into Martinez's sweatshirt pocket. It is the Government's burden to show probable cause in support of a warrantless search, which here includes the burden to show that the search occurred at a time when the officers had probable cause. The Government has not carried this burden.

### 3. *Search Incident to Arrest*

Under the recognized "search incident to arrest" exception to the search warrant requirement, "a police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area within his immediate control." *Davis v. United States*, 564 U.S. 229, 232 (2011) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)). As the Government recognized during the discussion at the end of the hearing, this exception is not a good fit in this case since Martinez was not arrested on the day of the stop, and the Supreme Court has "consistently held that a search can be incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest." *Shipley v. California*, 395 U.S. 818, 819 (1969); *United States v. Diaz*, 854 F.3d 197, 205 (2d Cir. 2017) (quoting *Shipley*).[6]

Further, the Court recognized the search-incident-to-arrest exception to the warrant requirement in *Chimel* because it was "reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest

---

[6] The Supreme Court has recognized a limited exception, permitting a "very limited," warrantless search of the defendant's fingernails in order to "preserve the highly evanescent evidence they found under his fingernails," but noting that "a full *Chimel* search would [not] have been justified in this case without a formal arrest and without a warrant." *Cupp v. Murphy*, 412 U.S. 291, 296 (1973) (reasoning that "[w]here there is no formal arrest . . . , a person might well be less hostile to the police and less likely to take conspicuous, immediate steps to destroy incriminating evidence on his person.").

or effect his escape," and in order to "prevent [the] concealment or destruction" of evidence on the arrestee's person. 395 U.S. at 763. Here, Task Force Officers had already conducted a pat-down for weapons and determined Martinez had none.

Most importantly, as with the exigent circumstances exception, a search incident to arrest is valid only if the officers have probable cause to arrest the subject. *See Rawlings*, 448 U.S. at 111 (approving warrantless search shortly before formal arrest because "the police clearly had probable cause to place petitioner under arrest"); *Cupp v. Murphy*, 412 U.S. 291, 296 (1973) (allowing limited, warrantless search "[o]n the facts of this case, considering the existence of probable cause"); *Bailey v. United States*, 389 F.2d 305, 308 (D.C. Cir. 1967) ("The arrest which justifies the search, however, is lawful only if the Fourth Amendment standard of probable cause is met."). As discussed above, the Task Force Officers have not shown that they had probable cause to arrest Martinez at the time they searched his pockets, so the search cannot be justified as incident to a lawful arrest.

### 4. *Plain Feel Exception*

The Government argues in its brief that the "removal of the money from Martinez's pocket and its counting was also in accordance with Fourth Amendment principles" under the "plain feel" doctrine. Gov't Opp'n, ECF No. 133 at 13. In *Minnesota v. Dickerson*, the Court held:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

508 U.S. 366, 375–76 (1993). As with the other exceptions to the search warrant requirement, however, the burden of proof is on the Government to show that an exception applies. *United*

*States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017). The Government has not met that burden here because no officer testified that he felt any objects at all during the pat-down of Martinez, let alone any object in his pocket. Without any evidence to support this exception, the Government's argument fails.

Because the Government has not shown that any recognized exception applies, I find that the warrantless search of Martinez's pocket violated his Fourth Amendment rights.

### 5. *Exclusionary Rule and the Good Faith Exception*

"A determination that a Fourth Amendment violation occurred, however, does not automatically require the suppression of all physical evidence seized or statements derived from that illegal search. Suppression is our last resort, not our first impulse." *United States v. Bershchansky*, 788 F.3d 102, 112 (2d Cir. 2015). The purpose of the exclusionary rule is "to deter future unlawful police conduct," specifically any "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* (citing *United States v. Calandra*, 414 U.S. 338, 347 (1974) and *Herring v. United States*, 555 U.S. 135, 139 (2009)).

Consistent with this goal, courts have recognized "an exception to the exclusionary rule for a search conducted in good faith reliance upon an objectively reasonable search warrant." *Bershchansky*, 788 F.3d at 112–13 (citing *United States v. Leon*, 468 U.S. 897, 925 (1984)). This exception "recognizes that if the officer is acting as a reasonable officer would and should act in similar circumstances, excluding the evidence would serve little deterrent purpose." *Id.* at 113. Courts have extended the exception to circumstances involving objectively reasonable and good-faith reliance on "binding precedent" even if decisions subsequent to the search held that the conduct was unconstitutional, *Davis v. United States*, 564 U.S. 229, 245 (2011; to circumstances involving good-faith reliance on a statute later declared unconstitutional, *Illinois v. Krull*, 480

U.S. 340, 349 (1987); and to circumstances involving officers' reasonable belief that they had valid consent to conduct a warrantless search of an apartment, *Illinois v. Rodriguez*, 497 U.S. 177 (1990). The Fifth Circuit has also applied a "good faith exception" where a police officer relied in good faith on a license plate report, accidentally generated for the wrong license plate number, in deciding to effect a vehicle stop. *United States v. De Leon-Reyna*, 930 F.2d 396, 400 (5th Cir. 1991).

In each of these cases applying a "good faith" exception, officers were relying in good faith on some typically reliable source—a warrant, caselaw, a statute, or a standard data report—none of which is present in this case. The "good faith" exception does not encompass all circumstances in which officers had good intentions; rather, the inquiry is "whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances." *Herring*, 555 U.S. at 145. Here, the Government has not shown any circumstances to suggest that reasonably well trained officers would not have realized that searching Martinez's pockets exceeded the bounds of a *Terry* stop. The Government argued after the hearing that the $650 was removed in "good faith," since the Task Force officers had an "objectively reasonable basis to search the pocket, even if the officers did it for the wrong reasons or they were mistaken in . . . the legality of their actions," November 27 Hr'g Tr. at 101, but neither this argument nor the evidence presented at the hearing supports applying a good faith exception. Well trained law enforcement officers are familiar with the difference between a *Terry* stop-and-frisk and a full search, and they are familiar with the probable cause standard required for the latter. I find that no "good faith exception" applies in these circumstances.

I also find that suppression is the appropriate remedy for the unconstitutional search of Martinez's pockets. In determining whether "the exclusionary sanction is appropriately imposed

in a particular case," courts must "weigh[] the costs and benefits" of suppressing otherwise reliable evidence. *Leon*, 468 U.S. at 906–07. Here, I find that suppressing the observation of $650 in cash—the immediate fruits of an unlawful search—from Martinez's criminal trial does serve to deter law enforcement officers from exceeding the scope of *Terry* stops and limited protective pat-downs, and that the deterrence benefits outweighs the costs of excluding the evidence. Courts have suppressed evidence stemming from similar conduct. *See Dickerson*, 508 U.S. at 373 ("If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed."); *Casado*, 303 F.3d at 449 (finding that the search of the defendant's pocket violated the Fourth Amendment, making "the fruits of the search, including the contents of the pocket . . . inadmissible against him").

## III.  CONCLUSION

Based on the evidence presented at the suppression hearing, and for the reasons set forth above, I conclude that the Task Force Officers exceeded the scope of a lawful *Terry* stop and protective pat-down and conducted an unlawful search of Martinez's pockets. I also conclude that the officers' unlawful search calls for the application of the exclusionary rule. So the evidence the officers obtained from that search—the observation of $650 in cash—cannot be used against Martinez at trial. But I deny the motion to suppress with respect to the observations of Martinez's conduct at 339 High Street, the observations of items in his hands during the lawful *Terry* stop, *i.e.*, the $200 in cash and the cell phone, and the subsequent observations of his cell phone screen while it was lying on the bags in the store vestibule.

IT IS SO ORDERED.

_____
/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
      December 6, 2019